Your Honor, may it please the Court, for the record, my name is Walter Dirks. I represent Minority Television Project, Inc. This is a case that involves several different aspects of the First Amendment. And I think it's been briefed well by both sides, so what I'd like to do is just focus on several points. Can I ask you a preliminary question? Your Honor, you have a tax-exempt status. Yes. And as a condition of that, are you required to refrain from commercial activity? I don't believe that's correct. I think that the Internal Revenue Code in this area has a category toward, I can't think of the right word, but like, for example, you would have an organization that has a magazine and generates income. There's a category of income you can have that it's taxable. That part is taxable. The classic example is, I think, somehow or other in the 1940s, the Columbia University wound up owning the Mueller Macaroni Company, and they argued that because they were a nonprofit, they shouldn't have to pay taxes on that, and the courts gave them a nice try award. So it is possible for a tax-exempt organization to have income. A classic example would be a tax-exempt organization that has a magazine and sells advertising there. Here, this is really different. This is underwriting announcements. And what you can say is underwriting announcements. But I wanted to get your attack. And in the tax-exempt status, can you engage in political activity? Engage in what? Political activity. If they wanted to, they could. There's a percentage of your income that can be used for that, because there are a lot of organizations, for example, that, you know, do lobbying work, support candidates for public office, like the Sierra Club would be an example. I know somebody who works for one of those organizations, and they have guys basically ruthlessly counting who's doing what to make sure they stay on the right side of the line. But here again, if you think back, the Legal Women Voters case from, I believe it was 1984, dealt with the prohibition that then existed in the Communications Act. It was then Section 399, ironically enough, that prevented editorializing on educational stations, and the Supreme Court struck that down. So I don't think that there's a tax issue here. And here it's a situation where the the the No, I was focusing on the tax to begin with, so that the First Amendment issue wasn't there. But you could keep your tax exemption and engage in political activity is what you're saying. It's proscribed. There's a percentage limitation. I don't pretend to be an expert in this area, other than knowing people who work for nonprofits who tell me that they have to keep extremely careful records so that the organization can assure themselves that they stay well away from the edge. Well, do you do that? Well, I'm a lawyer in Washington, D.C., so I don't have to do it. But my client, my client is not engaging in it. What my client wants to do is to be able to accept underwriting announcements. This is this is basically taking underwriting announcements provided by third parties. And that's what this case is about. It's not, again, it's not about the the the licensee of the station itself engaging in taking a position on a political candidate or on a an issue of public importance. It would be. They'd like to take advantage of some of all this money that's been expended by the politicians in this election campaign. Well, I think that actually it goes. Is that what you're saying? It's this concern goes back way prior to this current election. No, I'm just saying there's a lot of money expended by the politicians. There's a lot of money floating around, and the not just for politicians, but also on issues. Yeah. And that historically has been it. And also, it it goes beyond that. It goes to a concern about not getting into, once again, staying away from the edge of what arguably could get you into trouble under Section 399B. And I think that, you know, one of the concerns here, in fact, the lower view article that we cite, which was written by a former associate general counsel of the Association of Public Television Stations, just limiting himself really to the issue of the commercial speech was talking about how because of the vagueness of the way it's written and the way it's being enforced, that stations stay away from the edge. You know, it's a self-censor. And that's one of the arguments we have with regard to the vagueness. But the we have a series of issues. It's not just having to do with the issue advertising. It has to do with, you know, also the so-called limits on the promotional aspects by for-profits. But first, I'd like to start off and just briefly touch on the first issue we raised in our brief, which has to do with what level of scrutiny should have been required for this particular regulation. The district court went for intermediate scrutiny. We believe that post-Citizens United, with regard to political speech and with regard to issue speech, that the correct standard should be strict scrutiny. Kennedy. But Citizens United had nothing to do with regulating the bandwidth which the government regulates and has regulated since 1939. True? That's true. But what it did do was say that a restriction on what could be broadcast on an over-the-air station was unconstitutional using strict scrutiny. And if you followed the government's argument to its logical conclusion, what they're really telling you is if they took the broadcast prohibitions in 441B, which was the broadcast part of that, which said that an advertiser couldn't place an electioneering advertisement on a broadcast station, if Congress just reworked that same law and said the broadcaster couldn't broadcast it, the exact same ad from the exact same person, the level of scrutiny would drop from strict scrutiny to intermediate scrutiny. Just by some clever reworking of the statute, what they're saying is the government could prohibit the exact same conduct and get a lower standard of review. And I think if you look at it that way, the only fair conclusion you can draw is that Citizens United, by definition, changed the level of scrutiny that should go to the broadcaster. Did Citizens United discuss, was it League of Women Voters? No, it didn't. So League of Women Voters is still on the books. It's still on the books. But I think if you look at the ---- I mean, why should we sort of speculate what the Supreme Court did or didn't do? I mean, that's really we should we're told that we shouldn't assume that they've impliedly overruled one of their own decisions. Well, I think that if you look at the ---- We should let them do it. Well, I think if you look at the Planned Parenthood case and the cases it cited, if the later case of the Supreme Court is, you know, per se inconsistent with an earlier case, that you can rely on that. The ---- In fact, one of the cases that's cited in the Planned Parenthood case says we look for what the Court did, not what it didn't say. And so that's the basis of our argument here. And I think that, once again, if you look at it from the standpoint of what would happen if Congress took the exact same prohibition and instead of forbidding the advertiser, the advertiser forbade the broadcaster to take it. And what the government is really arguing is you should get different standards. It's similar to the difference that we have between public forums and limited public forums. The limited public forum here is a broadcast band. It's a limited public forum. It's regulated by the government. It hasn't since 1939. Well, it's the United had to do with the expenditure of money in any forum, in any media. No, it didn't. It was limited to three media. Satellite, cable, and broadcast. And the Supreme Court said they were not going to do that. Kennedy. Those were facts in those cases, but I mean, it was all statute. That was the statute, Your Honor. The statute was limited to satellite, broadcast, and cable. And the parties tried to differentiate between the three of them. And the Supreme Court said we're not going to do that. We're just not going to do it. The Supreme Court didn't have one standard for the broadcast part and another standard for the satellite and the cable part. And again, if you follow the government's argument, Congress could reenact the same ban on broadcast electioneering by the same people and no longer have strict scrutiny, have intermediate scrutiny. That's what they're arguing. Could we assume for some time that intermediate scrutiny applies? I'm sorry, what? Could we assume for a moment that intermediate scrutiny applies? Absolutely. Why didn't the district court err, applying intermediate scrutiny? Well, it erred several ways. First of all, the standard of what you have to look at is the bare rock minimum is substantial evidence in the record before Congress at the time it was enacted. Absolute rock bottom minimum. That's what Turner 2 announces at and relies on Turner 1. Substantial evidence of what? Substantial evidence in the record to support that the problems are real and that the solution is narrowly tailored. The two separate prongs of the – you know, one of the things that's happened here is the four-part test to some extent, now the three-part test, so you always got to be – I always get confused, but, you know, it's these third, fourth prongs is really now sort of looked at as reasonable fit, you know, narrowly tailored and directly advances. And then you have that the problems are real. You have to have substantial evidence in the record for both aspects of the thing. And if you actually look at the record, I submit that to say that the record is sparse is to be incredibly generous. What problem is, in your word, real or not real as to which the evidence must go? I'm sorry, what? I'll start again. You said the two requirements out of the problem for intermediate scrutiny, that the problem which Congress is facing is a real problem. And secondly, that the remedy that Congress arrives at is narrowly tailored. My question to you is, what problem did Congress see and why isn't there evidence to justify their view of that problem? Congress – the government says that Congress identified two things. One was to prevent influence. They were concerned about influence. The other was that the advertisers' influence, that is, that if advertisers paid the station, the station would play the advertiser's tune, right? That's correct. And the other one was the – the maintaining the programming. Now, if you actually go – you know, the other thing, there's another aspect here that the – that got lost in the shuffle when you were analyzing this. There's the overlay of the League of Women Voters case. And the League of Women Voters case said that when you're basically, you're talking about – in their case, they were talking about editorializing issues of public importance, there's another thing that's overlaid on top of this. And the Supreme Court put it – two variations of the same thing. One was, we must be especially careful in weighing the interests that are asserted and assessing the – with precision with which the ban is crafted. And then they also said we must be particularly wary in analyzing what the government wants to do, because you're talking about speech on the highest rung, political speech, issue on – speech on the issues of the day. And if you read the judge's opinion, and if you read the – I'm having trouble trying to identify how especially wary is different from wary. Well, they said it both ways. I think that they – you know, it's two variations on the same. The Supreme Court used both formulations in its opinion. And I think that what it's telling you is that this is – when you're talking about issue speech and political speech and the government's attempts to regulate it, if you're going to look at intermediate scrutiny, I describe it as sort of being intermediate scrutiny on steroids. It's more than intermediate scrutiny that you would get in, like, the Turner 1 and Turner 2 cases, which were content-neutral cases having to do with just cable carriage, had nothing to do with content at all. The League of Women Voters case was a content case involving, in that case, editorial – editorializing by the stations themselves in response to, you know, Judge Noonan's concern. And what the Supreme Court said was that because this was on the highest rung, we had to be particularly wary and especially careful in weighing it. And if you go and you look at the judge's decision, you would never guess there was that admonition from the court. And if you look at the government's brief, you would never guess that there was that admonition from the Supreme Court of the United States. And if you take this, what I call, you know, intermediate scrutiny on steroids analysis, which I think is really required by the League of Women Voters if you're going to use intermediate scrutiny, and look at the – what's in the record, you know, you need a microscope to find it. It's several people giving their opinions. Part of what they're relying on was people talking about other things. The person from the Association for the Blind was worried, basically, about the service that public stations provide for giving – reading things over the air so the blind who can't read can know what's going on in the newspaper. Kennedy, are you taking the position that Congress doesn't have sufficient evidence to enact a statute if all it has are the opinions of people testifying, that there's some rule, such as malpractice, that you have to have an expert opinion in order to supply the necessary burden of proof? Why aren't opinions enough for Congress? I think because you're talking First Amendment. Once again, we're talking about a test that doesn't apply in other areas. If they're passing a regulation regulating the interstate highways, the transportation system in some way, or the environment, or labor relations, none of those things impacts directly on the First Amendment. Here you're talking about a test that is designed for the First Amendment. And if you look at what actually happened in Turner II. Well, in Turner II, they looked at additional evidence to decide what was in the record before Congress. That's correct, Your Honor. That seems to suggest that your initial statement a few moments ago about the evidence in the record before Congress really was you have to go back to that original statement in Turner I. Well, I think Turner II is the later case. And if you look what actually happened in Turner II, they – I don't know if I should get you the quote here. They analyzed what was available before Congress. And they also analyzed there was a substantial other amount of evidence that was produced in the district court that was not in before Congress, the government produced. That's correct. And I can say the district court made findings of fact and conclusions of law based on everything. Well, except that if you actually read the opinion carefully, they first went through the evidence before Congress. And they said, we hold that Congress could conclude from the substantial body of evidence before it that absent legislative action, the free, you know, free over-the-air television was going to get lost. Then they said, after they got done saying, okay, there's substantial evidence before Congress, they went on to say that the evidence assembled later confirms it. But first, it's a two-step process. If you have to – Congress, there are other cases that it's pretty clear that Congress doesn't – you know, it's not hacking like a court. It doesn't have to be, as Judge LaBea said, it doesn't have to be expert evidence. It doesn't have to be – they don't have to compile an administrative record that we see in proceedings before the FCC. They don't have to compile the kind of record that we have in court proceedings. They can do it. It's too generous. They sort of operate in their own world. Right. But it's still – the court said substantial evidence before Congress. Interestingly enough, in a very recent case, a cable vision case out of the second – the D.C. Circuit, by the by, the court in a dissent quoted the FCC's brief, and the FCC's brief said that the standard was substantial evidence in the record before Congress. So I think that that's a bare minimum. And it's got – you know, and if you actually go and read, read what was being used to support it. For example, you have the guy from the Video Producers Association saying don't do it. He's not supporting it. He's saying it's a horrible idea. The world as we know it will end if you pass this thing. He wasn't supporting it. He was opposing it. And the guy from the Association of the Blind was talking about something totally different. He wasn't talking about the restrictions on underwriting announcements. He was concerned that somewhere along the line, this service, this extra service that was being provided to the blind, reading the newspaper, including the advertising, interestingly enough, wouldn't get lost. Kennedy, in your lexicon, similar to the rules that we have in trials as to the non-suit, if there's any evidence in which a rational trier of fact can find the elements of the cause of action, then there's substantial evidence, right? Including opinion evidence. Well, except that you have to have – if you have opinion evidence, that's normally people who have qualified to be experts. Not necessarily. It could be opinion evidence of the owner of property. He can give an opinion as to his property. Lay opinion. Okay. But the speed of an automobile was. Okay. But the thing is, if you look at what they – if you actually go back and look at the record and parse what people said, were they addressing these exact issues? Not really. The guy from the Boston Public Television Station was basically saying, oh, you're going to blur the line, you're going to blur the line, whatever that means. So I think that if you actually go back and read what's in the record, you walk away saying, I give up, where is it? So you say there was no evidence before Congress which would allow a reasonable Congress to determine that advertisers would influence content or B, that these public television stations and radio stations would not carry certain educational programs. I would say there's not substantial evidence in the record as defined by the Supreme Court. I said I don't know, too. And also there's a second thing. Whether or not the remedy they've chosen, you know, passes the third and fourth prongs of the test. And there again, if you look at your – at the Ballin decision that's from this Court, one of the things that would happen in that case was the Court looking at the fact that they – that the – that a content-based remedy had been chosen. And the Court was pretty clear that the fact that a content-based remedy had been chosen was a strong indicator that the – the Court at the – at the local community had – had not come up with a – with a narrowly tailored restriction. And as the Court said in Ballin, the city's use of a content-based ban rather than a valid time, place and manner restriction indicates that the city has not carefully calculated the costs and benefits associated with the burdens on speech imposed by its discriminatory content-based prohibition. Now, the interesting thing about the Ballin case is that was a case that was discriminating between categories of commercial speech. Also, what's interesting, and I – Breyer, you're running out of time. Okay. You're over time, I think. Okay. Then I'll just leave it at that. I'd like to – I'll give you a minute for rebuttal. Okay. Thank you. May it please the Court, Mark Stern for the appellees, the FCC in the United States. The district court in this case wrote actually two very thorough decisions analyzing all of the arguments that are presented here. And I think that the court's – Could I ask you a little opening question? How did the magistrate end up being the judge? I'm sorry. That I didn't deal with the case of district court. I don't know your answer. What's that? I believe the district court adopted the magistrate's opinions, but I wasn't handling the case of district court. I mean, this seems to me a fairly important case, and it ends up with a magistrate judge. I'm sorry, Your Honor, I can't speak to that. I think they have a will assignment nowadays where cases are randomly signed for magistrate judges off the will. The parties have to – They have to agree to it, don't they? Well, I think it's assumed. You don't know the answers. I'm sorry. I don't know the answer, but I do think that the decisions written by a magistrate judge are not – are very good decisions that cover the issues, and the question is the same. Mr. Stern, tell me this. Let's see if I have it right. It is not a violation of 399B for a public television – a public radio station, a public television station to accept a paid advertisement for a non-profit institution, say the Sierra Club, right? That's right. They can take money and say the Sierra Club walks on water, right? But they can't take a dime from General Motors. Now, how does that – I guess General Motors is still attempting to get a profit, but – Their last dime. But how – what is the basis for saying non-profits can advertise for money, but for-profits cannot advertise for money? Do you think that there's any rational basis to say that the Sierra Club will not affect the content of public radio any more than General Motors? Your Honor, I think – I mean, there are a couple of principles at work, and one is that it's been recognized repeatedly in the First Amendment context under-inclusiveness, including under-inclusiveness of this kind, which was at issue, for example, in the do-not-call-us decision of the Tenth Circuit that we cite, the mainstream marketing. What the courts have repeatedly said is that Congress – You're going to an abstraction. Answer my question. Do you think that there's any rational basis? Do you think that the Sierra Club has no designs on the content of public radio different from those of the greedy for-profit? Your Honor, I think that the primary – a friend has given some rationales to the statute. I don't think he addressed the primary rationale, which perhaps does go to Your Honor's question, which is that Congress from – wanted to preserve the status of public television as not having advertising and wanted the political – But it allows advertising for non-profit. That's right, Your Honor. Then the question is, did – does the statute become invalid because when Congress loosened the restrictions in 1981, because – It discriminates in favor of non-profit. Well, let's be clear that – and against commercials. Your Honor, there is nothing – going back to the generalization, there is nothing wrong with that. And to be clear, nothing – we've got one instance in the last 30 years in which this has come up. The – what Congress did was that it went for what was perceived to be the principal source of paid advertising. And the point about the advertising is it's not simply the idea of wanting to influence the content. It's that if stations become advertising-dependent, what happens is – and this was – this is the theme throughout the legislative history and going back to 1952 – if stations are going to have to compete for advertising in the market, which they will, because without being evil people, that is far and away the most efficient way to get money, they will have to, in order to attract advertising dollars, they will have – they will change their programming because the Supreme Court has recognized the – you get more advertising dollars by getting more viewers. That's the premise of the ban on advertising in public television. So when Congress looked at this in 1981, and it did so on the basis of the fact that as the district court said, Congress is not riding on a blank slate in 1981. It was acting on the basis of 30 years of experience of the FCC review. It was dealing with an FCC report. And what Congress is – look, we have to make television stations, public television stations, more self-reliant. There's going to be less Federal funding. And it said, so what can we do to strike a balance here? And what they came up with was this compromise. So this itself was, in a sense, the narrow tailoring that plaintiffs is asking for, saying, well, why have a total ban? Well, that was the situation. Congress loosened that restriction. And now plaintiffs are saying, well, they should have. Scalia, They could have restricted it another way. They could have said, you can't have any source of advertising which is more than 1 percent of your gross net worth. Yes, Your Honor, they could have, but they didn't, and they weren't required to. And as to commercial, well, under the First Amendment, if they're doing content-based censorship, they might very well have to. I disagree, Your Honor. I'm sorry. But the – I think that the cases that mainstream marketing and the cases that are cited in mainstream marketing make clear that Congress doesn't have to, even in the First Amendment. That was a First Amendment case, and the do-not-call list did not apply equally to all kinds of speech. And the Tenth Circuit, well-grounded in authority, said, look, that's not a problem. And here, what we have is over 30 years, we don't – this has come up, like at least this one FCC order. If there are some other cases, there are, you know, very few, and the non-profit – the one non-profit, like, statement that was at issue was itself not actually holding things out for, like, for – in a way that would probably even have triggered the statutory restriction. So when Congress goes and it addresses what are by far the primary sources that it's trying to deal with, it is not a constitutional defect that it left out for the FCC or the non-profit organizations. What is critical is that it – what it did is gear to the nature of the problem. It certainly, like what Plaintiff wants to run, are either commercial, which it has run, or it says it wants to run political ads. That's what he wants to run. So it's a bit of a problem. Kennedy, I'd like to ask you a different set of questions, but based on my very limited experience in listening to public television, I have had the impression that they regularly ran advertisements for services or products. And I want to give you three examples, and you can tell me why they are not advertisements for a service or a product. I think they all appear on the Jim Wehrer News Hour. One is for Charles Schwab Investment, where the service being offered is investment advice, and the announcement is, talk with Chuck. If that is not a direct advertisement of the business of Charles Schwab, I don't know what is. On the same program, they often have an exterminating company advertise the extermination of bugs. It's a very disagreeable ad. I don't remember the name of the company, but they show bugs being exterminated, and they invite the viewer to use their services in exterminating bugs. So that's a gross ad and a distasteful one. And then there's a third ad run by Northwest Mutual, which often has shown two retired couples up in the wilderness enjoying fishing and hunting on their retirement income from Northwest Mutual, and it's a clear invitation to buy annuities that will permit you to retire in the same leisure. Now, if that is the standard, obviously, it's either too vague or it's never enforced. I'd like your comment. There is a, in fact, I mean, I think we have to work first from the statute itself, which I think that the terms of the statute are not impermissibly vague. The FCC's application of it, which is discussed in the orders that actually originally gave rise to this case, distinguished between sort of general statements of what's available and things like price advertisement and, in particular, comparison advertisements. Like, we are insurances better than anybody else is. You know, we have more agents than anybody else. And what Congress, because what the FCC has had to do is to try and make the line that Congress drew, and it's given some steps and it's given clear guidelines, and notwithstanding the claim that this is not a standard that a person of reasonable intelligence could apply, in fact, there, we don't have the problems that are actually being presented here of why this is so difficult to understand. I mean, the actual advertisements for which the FCC actually issued its probable cause notice and then had a hearing on. Well, would you deal with the three examples I gave you? Well, Your Honor, the way that you described them, they are not engaging in comparison, statement of price. And I think that on one of them, you had said that the, you know, there was a statement to buy something. I don't know whether, like, if it was an implication to buy something, which obviously is an hearing. Well, obviously an investment company saying talk with us is not offering free advice. Your Honor, I can't sort of, like, I know that I talk to Chuck. You don't know, though. You don't watch TV enough to know. Your Honor, look, talk to Chuck, as far as I know, is just the general slogan of the Charles Schwab Company. But what is it asking people to do? What is it offering? Your Honor, if let's imagine that the FCC made a mistake. Let's assume that the FCC has made ten mistakes. A thousand mistakes. Let's assume it made a thousand. Agencies do make mistakes. That does not render their statute unconstitutional. If every statute was rendered unconstitutionally vague when an agency got things wrong, we wouldn't really have very many statutes left. Well, it's a matter of degree, correct? I think it is, perhaps, but here what we have is a statute whose language is plainly not sort of impermissibly vague. And while there are lots of statements made about why nobody could possibly follow this, in fact, what the FCC has said is sort of bending over backwards, even though plaintiffs sort of suggest this is a defect. The FCC has said, look, if you're having trouble, what we just want is good-faith compliance. That's usually thought to be good, not bad. It's not, you know, that should be a good thing. It's also the case that if there is a doubt about, you know, what the FCC's view is, the FCC is there to be contacted. It's said so many times. And that's not come up because we don't actually have a question about some ad being impermissible, where it's not clear what it's supposed to be. Mr. Stern, what was the record before Congress which would justify the content-based limitation prohibiting political speech under 39B? Your Honor, the – it's not – it's political ads, I mean, which is very poor ads, because you can have all the political – there is no restriction on the political program. Thank you for the correction, political ads. What is the evidence saying? Well, the evidence is – the point about political ads is it's that they are – they are a source of money, that what Congress has said – So that – so that heaven forbid National Public Radio would favor one party over another? No, Your Honor, it doesn't have to be that. It's that if you are getting into the marketplace – this was the whole idea. We don't want you in the marketplace of selling ads. It doesn't matter if you're selling them, like, taking part of the $4 billion that are sloshing around this year, or whether you're getting money from General Motors or anyone else. But it's all right to enter the marketplace for money from non-profits. That's okay. Setting aside the non-profits for a moment, the – what Congress didn't want, this was from the very beginning, all through 1981 to the present, what Congress has said is I don't want you out there competing for money, because if you do, that's the mechanism by which – But it's okay to compete for non-profits' money. Your Honor, I don't have a lot more to add to what I said before, but I don't think that's a constitutional defect. There was no, like, indication that that was a problem. There's no indication since. And under-inclusiveness is not a vice when it does not actually, like, go to suggest what Congress was after, like – I mean, it's not like Discovery Network, for example, when what – where there was a gross disproportion in what the CEO was making. Suppose we were to make a finding, you know, if there was some evidence that certain non-profit organizations, right, competed for public approval and maybe even for votes with profit organizations. Now, then Congress would be on the side of saying you can get all the money you want from non-profit, but you can't touch the profits. Your Honor, I think that if there were a real problem that arose, it would be for the FCC and Congress to address it. It hasn't arisen, and the point is it really hasn't arisen, but it did. Roberts. That's not what the appellant says. Well, you know, here's what. I mean, they're just not – if there are a handful of cases, that's a lot, and there's one FCC decision, and the point is even if there were more than – it's not a question of whether they're, like, 5, 10 or whatever. Congress was really – I mean, the Supreme Court couldn't be more emphatic about the fact that in Edge Broadcasting and lots of other cases that Congress doesn't have to deal, even in the First Amendment area, with all aspects of the problem at one time, and it certainly has dealt with the, you know, gigantic sort of proportion of the problem. There's certainly no suggestion that the – like, the fact that there, like, is not a ban on seeking not-for-profit advertising has in any way, like, had an impact or that there are – or that there's any substantial amount of it. The real point is, like, what did Congress do? Its rationale is, I don't want you to get into the marketplace. There is not a – there is nothing in Plaintiff's brief that says, oh, that's a crazy idea. Imagine how, like, the idea of getting into the marketplace would actually make you sort of change your programming. There's evidence from Congress from 1952 on when the district court, in an abundance of caution, says, look, I know there's evidence before Congress, but I want to make really sure. And the government went and we put in the declaration of Professor Knoll and declarations from G.B.H. sort of to further support, particularly the Knoll declaration, to confirm that, yes, it's not that these things were true and that they're not true now. It went through all of this in detail. And – but it was all there, but the idea that there was no substantial evidence before Congress, I mean, there was really – there was a whole history of this. There was an FCC report. There was testimony to Congress. And what the Supreme Court has said is Congress need not make a record in the way that an administrative agency needs to. This is a lower standard, not a higher standard. And national – and the League of Women Voters case is dealing – in no way implicates the concerns here. That was not a concern. So what did Congress – what did the Supreme Court mean when they talked about substantial evidence before Congress? Well, I think that what they wanted in Turner, in Turner 1, was that they were concerned – I mean, that was the must-carry case. And they had evidence, and it was a fairly sort of onerous requirement. And what they said – and the Court said, well, there is evidence, but I want to make really sure that this – that this fairly onerous requirement was justified. And then it went down. As district court here, I think, looking to Turner, said, look, I don't want to get reversed later. Let me get the evidence in now. So we got more evidence in now. And then we have the same situation as in Turner. And when Turner 2, the Court perhaps concerned that Turner 1 might have been over-read in terms of what it was requiring, has several paragraphs in that decision that go out of its way to stress the deference that's owed to Congress and the fact that Congress can rely just on common sense and on all kinds of testimony, as indeed was true in Turner, where there were statements from industry executives and so forth of the same kind that are referred to here. And, you know, so I think, yes, there's substantial evidence, certainly enough, you know, in this case. I mean, this is – this is sort of the fundamental proposition of, you know, public TV. All right. Thank you. Thank you so much, Your Honor. You've got one minute, one second. One minute. I can speak to that, but from New Jersey. All right. You've got one minute. Okay. A couple of things. First of all, it's important to remember what's going on here. One of the things we're challenging is a content-based restriction which actually inverts – inverts the constitutional requirements. They give more protection to commercial speech than noncommercial speech. Noncommercial for-profits can promote their goods and services. Planned Parenthood, if they wanted to, could go on – this is a facial – this is a facial thing again – could advertise abortion and reproductive services. A for-profit hospital couldn't advertise the same thing. Image advertising. Image advertising for for-profits is okay because they're not promoting goods and services. What you can't do is do political or issue. That's exactly what the Supreme Court in Legal Women Voters says you can't do. You're inverting things. Deference is specially careful and wary. That's what the Supreme Court said. It's not just Turner. It's more. It's Turner on steroids. All right. One final point, if I might, vagueness. Go back and look, if you would, to what the – what the actually said – what the Supreme Court said in the case of 399B and promoting for for-profits, it said it has become aware of significant uncertainty and controversy concerning various aspects of 399B. Then they pass a policy that's changed. Okay. You're way out – it's 21 minutes – it's 21 seconds over the 1 minute that I gave. Okay. Thank you very much for your – for your indulgence. We appreciate your arguments and matters submitted. We're in recess now until tomorrow. Thank you.
judges: Noonan, Paez, Bea